IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Corie Cullins, ) | |
| ) | Civil Action No. 8:04-0983-HFF-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Anderson Area Medical Center, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

    This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In his complaint, the plaintiff alleges against the defendant Anderson Area Medical Center, Inc. ("AAMC" or "defendant"), his former employer, causes of action for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, and the South Carolina Human Affairs Law; (4) retaliation in violation of Title VII and the South Carolina Human Affairs Law; (5) race discrimination in violation of Title 42, United States Code, Section 1981; (6) breach of contract accompanied by a fraudulent act; and (7) slander.

    Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

    The plaintiff, who is a black male, was hired by the defendant in 1991 as a Computer Operator Trainee at an hourly wage of $6.53. He held various jobs with the

defendant until March 1998, with his wage increasing to $8.57 per hour (pl. dep. 232-36). On March 9, 1998, the plaintiff became a Computer Technician Trainee at an hourly wage of $9.00. Cherry Croker Kent became the plaintiff's supervisor in 1998 or 1999 as the Manager of Network Services (pl. dep. 236-37, 242). On or about January 9, 2000, the plaintiff was promoted to Junior Computer Technician and received a pay increase to $10.40 per hour (pl. dep. 238, ex. 27). On March 5, 2000, the plaintiff was promoted to Junior Network Engineer and received a pay increase to $14.21 per hour (pl. dep. 239-40, ex. 28). On April 1, 2001, he received a 4% pay increase to $14.78 per hour (pl. dep. 241, ex. 29).

In August 2001, the plaintiff received a written reprimand for "unsatisfactory work performance." In the employee comment area of that warning, the plaintiff wrote that the reprimand was the "first step of Roy [Fairchilds, Assistant Manager of Network Services,] and Cherry [Kent] trying to get [him] fired." The plaintiff also wrote that he felt he was a target because of his race and noted that other persons had not been written up for similar conduct (pl. dep. 261-70, ex. 37). According to the affidavit of Fairchilds, a hospital-wide conversion of the defendant's network system, which included all the computers in the hospital, was implemented in the summer of 2001. According to Fairchilds, the plaintiff failed to timely complete his assignments, "submitted sloppy and incomplete documentation and untruthfully told [him] the projects were completed when they were not" (def. reply, ex. 3, Fairchilds aff. ¶¶ 3-4).

On March 31, 2002, the plaintiff received a performance award and corresponding pay increase to $15.52 per hour (pl. dep. 241, ex. 30). On April 14, 2002, the plaintiff was promoted to Network Engineer and received a pay increase to $17.07 per hour (pl. dep. 242, ex. 31). During the time that Kent was his supervisor, the plaintiff received several promotions and pay increases that nearly doubled his salary (pl. dep. 242). Kent reported to Darrell Hickman, who was the Director of the Information Services

Department. The plaintiff stated in his deposition that he was treated the same as two other white co-workers, Ben McCall and Brian Crowther, with respect to the promotions to Junior Network Engineer and Network Engineer (pl. dep. 273-74).

On February 13, 2003, the plaintiff, along with three white co-workers, received a written reprimand and warning for "inappropriate behavior and excessive horseplay at work" (pl. dep. 196-97, ex. 12). The reprimand apparently arose from a situation that occurred on January 22, 2003, when the plaintiff sent an e-mail to four co-workers in which he joked about a married church deacon going to a church concert with a woman other than his wife (pl. dep., ex. 8). One of the recipients of the e-mail, Brian Crowther, complained to Kent that he was offended by the e-mail (Kent dep. 77). In the process of the investigation into the incident, the plaintiff complained that he was enduring a racially hostile work environment (Kent dep. 77; Hickman dep. 15-16). When asked in his deposition to identify the persons he believed discriminated against him, the plaintiff named Kent, Fairchilds, and Hickman (pl. dep. 160-63).

The plaintiff claims that after his complaints of racial harassment, Kent and Fairchilds "began scrutinizing [his] work" and "discovered an outstanding work order that had been in the system for an extended period of time" (pl. resp. m.s.j. 4; Kent dep. 71, 78). On February 4, 2003, the plaintiff met with Hickman to discuss the outstanding work order (order #21461). The work order had been assigned to the plaintiff in February 2002, and on January 8, 2003, the plaintiff had been asked about the status of the work order. According to the plaintiff, he explained to Hickman that he had inadvertently deleted some notes from the old work order and then created a new one due to the error. After the meeting between Hickman and the plaintiff, the plaintiff's password was utilized to log into the defendant's system at 5:15 p.m. and alter the work order at issue (Hickman dep. 46-47; pl. dep. 219-22). According to Hickman, "the old work order [was made to ]look like [the plaintiff] had described to me" (Hickman dep. 38). A security camera shows the plaintiff

3

leaving the building on February 4, 2003, at 5:08 p.m. and returning at 5:19 p.m. (pl. dep., ex. 3, 14).  According to the plaintiff, he went to pick up his daughter from daycare in the interim (pl. dep. 220-21).  He claims that someone else used his password to alter the work order and opined it was "a collaborative effort between Cherry [Kent] and Roy [Fairchilds]. Especially after I reported them" (pl. dep. 222).

       Hickman testified that he later went to the plaintiff's child's school with the plaintiff to determine if it was possible for the plaintiff to make the trip during the time period that he claimed he made the trip on February 4th.  He determined that it was not physically possible (Hickman dep. 38-39).

       Kent testified in her deposition that she had looked at a report that a password cracking program had generated and that passwords were included in the report.  She further testified that she looked only at the first page of the report, and she "got nobody's password from that report" (Kent dep. 29-31).

       On February 17, 2003, the plaintiff received disciplinary action in the form of suspension without pay for five days and a warning "that additional infraction will result in discharge" for (1) falsification or improper handling of records; (2) lying about work orders; (3) accessing the official work order system after clocking out; and (4) falsification of work order records to agree with his previous false statement (pl. dep. 198-200, ex. 13). Following his suspension, the plaintiff was instructed to bring his laptop computer in to Kent. The plaintiff claims that Kent and/or Fairchilds searched the laptop's hard drive and discovered that a human resources file was on the computer.  The plaintiff's employment was terminated on April 3, 2003, for having a file containing salary information (the "salary book") on his computer without having a work order for it.  The plaintiff testified that both Hickman and Kent knew that two white network engineers had possession of the salary book when the three of them were negotiating their promotions from Junior Network Engineer to Network Engineer (pl. dep. 291-92).  In his deposition, Hickman stated that the

4

plaintiff alleged to Kent that other network engineers (Crowther and McCall) also had the salary book. According to Hickman, the allegations were not investigated because the plaintiff was not a credible source (Hickman dep. 72-73).

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### *Race Discrimination*

The plaintiff alleges that "he was treated more harshly in the terms and conditions of his employment and was disciplined more harshly than Caucasian employees who committed the same or more serious acts," in violation of Title VII of the Civil Rights Act of 1964, as amended; Title 42, United States Code, Section 1981; and the South Carolina Human Affairs Law (pl. resp. m.s.j. 7).

Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), the allocation of proof is as follows: (1) the plaintiff-

employee must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802-03).  The elements of a plaintiff's *prima facie* case are the same under Title VII and Section 1981.  *See, e.g. Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281, 1285-86 (4th Cir. 1985).

The plaintiff first alleges that he was disciplined more severely than other similarly-situated employees on several occasions. To establish a *prima facie* case, the plaintiff must show that (1) he is a member of a protected class, (2) he was performing his job satisfactorily, (3) he was subjected to an adverse employment action, and (4) he was treated differently than similarly situated persons outside the protected class. *Guthrie v. Blue Ridge Savings Bank*, 159 F.Supp.2d 903, 908 (W.D.N.C. 2000).  Employees are similarly situated only if they "'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Heyward v. Monroe*, No. 97-2430, 1998 WL 841494, *2 (4th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1982)).

The plaintiff alleges disparate treatment with regard to discipline in three instances:  (1) for failing to timely complete a work order in August 2001; (2) for falsifying documents; and (3) for possessing an unauthorized file on his work computer (pl. resp. m.s.j. 8).  With regard to the August 2001 write-up, the plaintiff claims that a white employee, Makinsey "Mac" King, had been assigned the project along with him.  He claims that he finished his portion of the assignment, but King failed to timely complete his portion

7

of the assignment. The plaintiff claims he completed King's portion and turned it in to Fairchilds (pl. resp. m.s.j. 8-9; pl. dep. 262-64). The plaintiff received a write-up for failing to timely complete his assignments, "submitt[ing] sloppy and incomplete documentation," and "untruthfully" telling Fairchilds "the projects were completed when they were not." However, King did not receive a write-up (def. reply, ex. 3, Fairchilds aff. ¶¶ 3-4). Following the August 2001 write-up, the plaintiff received two pay raises and a promotion. Further, there is no evidence that the plaintiff's termination in 2003 was in any way connected with this write-up.

The plaintiff next alleges disparate treatment as to his suspension for allegedly falsifying documents and his subsequent termination for possessing the salary book, which the defendant terms an "unauthorized file," on his work computer. According to the defendant, the plaintiff's employment was terminated "because he engaged in a series of violations of hospital polices and procedures," the last of which was the plaintiff's unauthorized possession of the salary book (def. m.s.j. 24). The defendant states that the incidents that occurred on February 4, 2003, with regard to the manipulation of the work order, also contributed to the termination decision (def. m.s.j. 24-25). Clearly, the plaintiff's termination is an adverse employment action.

The plaintiff testified that both Hickman and Kent knew that two white network engineers also had possession of the salary book when the three of them were negotiating their promotions from Junior Network Engineer to Network Engineer (pl. dep. 291-92). In his deposition, Hickman stated that the plaintiff alleged to Kent that other network engineers (Crowther and McCall) also had the salary book. According to Hickman, the allegations were not investigated because the plaintiff was not a credible source (Hickman dep. 72-73). The defendant notes in its reply memorandum that Crowther and McCall have submitted affidavits that they never had the salary book on their hard drives and that Kent has testified that she first heard the plaintiff's claim that others had the confidential document after the

plaintiff's termination (def. reply 3-4). It appears to this court that the plaintiff can establish a *prima facie* case of disparate treatment.

The defendant has articulated a legitimate, non-discriminatory reason for terminating the plaintiff's employment. The defendant claims that the plaintiff was terminated "because he engaged in a series of violations of hospital policies and procedures, all of which showed unacceptable conduct and unsatisfactory work performance" (def. m.s.j. 24).

Accordingly, in order to survive summary judgment, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "'[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Id.* at 147 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519 (1993) (emphasis in original)). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 826-28 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

The plaintiff notes that while the defendant wrote him up for allegedly falsifying documents by changing a work order on February 4, 2003 at 5:15 p.m., the security camera

showed that he left the facility at 5:07 p.m. and did not return until after 5:19 p.m (pl. resp. m.s.j. 13).  Further, the plaintiff notes that the defendant's only evidence that the plaintiff supposedly altered the work order was an audit log showing that the plaintiff's ID was used, even though the defendant knew that a hacking program had been run on the network by an employee and that individuals' passwords had been captured by the program (Kent dep. 20).  With regard to the salary book incident, the plaintiff has presented evidence that the defendant's supervisors knew that two white network engineers also had possession of the salary book (def. m.s.j. 19), but they were not investigated.

As set out above, in *Reeves,* 530 U.S. at 147, the Supreme Court stated, "'It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original).  The plaintiff summarizes his evidence of pretext as follows: "Given the disparate treatment of Plaintiff versus his Caucasian co-workers, sufficient evidence exists to permit a factfinder to find that Defendant discriminated against Plaintiff and impaired his contractual employment rights *because of his race*" (pl. resp. m.s.j. 12) (emphasis added).  This court disagrees.  The plaintiff provides no facts from which a jury could infer a discriminatory bias or animus on the part of the plaintiff's supervisors.  "The protected trait 'must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'"  *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves*, 530 U.S. at 141).  "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 142 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The plaintiff has put forth no evidence that his race was a factor in any of the defendant's decisions.  Based

upon the foregoing, this court recommends that summary judgment be granted on this claim.

The plaintiff also alleged in his complaint that he was subjected to a racially hostile working environment and the defendant discriminated against him with regard to training opportunities and equipment (comp. 1, 2, 5, 7-9). While the defendant has moved for summary judgment on these claims (def. m.s.j. 17-24), the plaintiff did not address the arguments in his response to the motion for summary judgment and has apparently abandoned those claims. *See* Fed.R.Civ.P. 56(e). Furthermore, for the reasons stated in the defendants' motion for summary judgment, this court finds that summary judgment should be granted with regard to the plaintiff's claims for hostile work environment and disparate treatment with regard to training and equipment.

### *Retaliation*

The plaintiff next alleges that he was suspended and subsequently terminated in retaliation for his complaints of racial harassment (comp. 8-9). Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" 42 U.S.C. §2000e-3(a). In order to establish a *prima facie* case of retaliation, the plaintiff must show that "'(1) he engaged in a protected activity; (2) the employer took adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action.'" *Matvia v. Bald Head Island Mgmnt.*, *Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)).

In the employee comment area of the August 2001 warning received by the plaintiff, the plaintiff wrote that the reprimand was the "first step of Roy [Fairchilds, Assistant

Manager of Network Services,] and Cherry [Kent] trying to get [him] fired." The plaintiff also wrote that he felt he was a target because of his race and noted that other persons had not been written up for similar conduct (pl. dep. 261-70, ex. 37).  In January 2003, during discussions related to an e-mail sent by the plaintiff that another co-worker found offensive, the plaintiff complained to Hickman about the way he was being treated by his co-workers and supervisors (Kent dep. 77).  Hickman requested that the plaintiff provide him more information about his allegations of discrimination.  The plaintiff exchanged several e-mails with Hickman and wrote a summary of different incidents that he considered discriminatory (pl. dep. 300-301, ex. 40).  He was suspended from employment for five days in February 2003, and he was subsequently terminated in April 2003.

Construing all inferences in the light most favorable to the plaintiff as the non-moving party, the plaintiff can establish a *prima facie* case of retaliation:  he engaged in protected activity in August 2001 and in January 2003 when he complained of racial discrimination; he suffered an adverse employment action when he was terminated from employment; and the temporal proximity of the events in 2003 is sufficient to establish a causal connection.  *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

As discussed above, the defendant has articulated a legitimate, non-discriminatory reason for suspending the plaintiff and terminating the plaintiff's employment. The plaintiff offers no further evidence to establish that this reason was pretext for retaliation. The Fourth Circuit Court of Appeals has recognized that courts do not sit as a "'super-personnel department weighing the prudence of employment decisions'" made by employers.  *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997)).  An employer has the right to take a personnel action against an employee for a good reason, a bad reason, or a reason based on erroneous facts, as long as its actions are not for

discriminatory reasons. *Id.* Based upon the foregoing, summary judgment should be granted on this claim.

### *State Law Claims*

The plaintiff also alleges state law causes of action for breach of contract, breach of contract accompanied by a fraudulent act, breach of the covenant of good faith and fair dealing, and slander. As it is recommended that summary judgment be granted on the plaintiff's federal claims, the court should decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims. *See* 28 U.S.C. §1367(c).

### **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment be granted.

                                                 s/Bruce H. Hendricks
                                                 United States Magistrate Judge

July 29, 2005

Greenville, South Carolina